The **LIBMAN COMPANY,** Plaintiff,

v.

**VINING INDUSTRIES, INC.,** Defendant.

No. 93–CV–2283.

United States District Court,
C.D. Illinois.

Jan. 24, 1995.

John Jenkins, Gunn & Hickman, Danville, IL, and Basil P. Mann, Richard M. LaBarge, and Michael R. Graham, Marshall O'Toole Gerstein Murray & Borun, Chicago, IL, for the Libman Co.

David N. Bruce, Michael A. Marrero, and Donald J. Mooney, Benesch Friedlander Coplan & Aronoff, Cincinnati, OH, for Vining Industries, Inc.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL ORDER

BAKER, Senior District Judge.

This is a case seeking damages and equitable relief for infringement of a registered trademark. The court's jurisdiction is predicated upon 15 U.S.C. § 1121(a) and 28 U.S.C. § 1338(a).

### I.

The Libman Company (Libman) manufactures brooms, mops and brushes and sells them in the national market. On April 6, 1993, Libman's mark for upright brooms: "a contrasting color applied to the fibers or filaments of a broom head in the form of a wide vertical line or band along one vertical edge of the broom head fibers or filaments" was registered as a trademark on the principal register of the United States Patent and Trademark Office. The registration shows the application was filed on March 12, 1990 and that in the course of the proceedings it was established that the mark was first used by Libman in commerce on April 30, 1990. There was no opposition to the registration of the mark.

The defendant, Vining Industries, Inc (Vining), claimed at the outset of the suit that Libman's mark was invalid because commencing in 1989, before Libman registered its mark, Kaminstein Imports, Inc. had marketed an Italian yellow and black bristled broom in the United States. In the course of the trial, however, Vining abandoned that argument, dismissed its counterclaim and withdrew its claimed license agreement with Kaminstein as an exhibit.

In September 1993, Vining purchased the O'Cedar line of mops and brooms from The Drackett Company. O'Cedar is a well known line of brooms and is a national competitor of Libman. Vining continued the O'Cedar line and does not dispute its responsibility for the sale of the brooms that are at issue in this case. In January 1992, Vining decided to introduce a new O'Cedar product called the O'Cedar 2000. This broom has a band of dark gray bristles at the heel of the broom contrasted with the lighter gray bristles at the front of the broom. It is this O'Cedar 2000 broom and a later produced Professional Products Extra Wide broom that Libman claims are an infringement of its trademark.

In 1990, Libman produced a line of brooms called 201 brooms. These brooms made use of Libman's patented off-centered and angled handle and were called the Libman Precision Angle Broom. The bristles of the 201 broom are of even length. When they are placed on the floor, the handle of the broom angles at about 5 degrees from the vertical toward the back edge of the broom, i.e. the edge closer to the sweeper's feet. The trademarked, narrow, contrasting color band is located at the front edge of the broom, the edge farthest from the sweeper's feet. The first 201 brooms had a red contrasting color band at the front edge and the rest of the bristles were gray. These brooms were placed in commerce in April, 1990.

In 1991, Libman began to make 201 brooms with green contrasting color bands and the remaining bristles gray. Libman also began to produce and market a 205 broom, the Libman Large Precision Angle broom. It was a large version of the 201 broom and had the same color stripe. The Libman 910 broom, introduced in 1994, is a

heavy duty version of the 205 and bears the same markings and a contrasting color stripe. All Libman brooms have bristles of even stiffness, front to back.

Libman has advertised its contrasting color band brooms to consumers through magazines such as Family Circle, McCall's, Good Housekeeping, Better Homes and Gardens, For Women First and Woman's Day. It has advertised to the trade through brochures, flyers and trade magazines. Recently, Libman has undertaken some television advertising.

Libman has protested the sale in the United States by Kaminstein Imports of an Italian produced broom with a color stripe but has not filed an infringement action. Libman filed suit against Rubbermaid for infringing Libman's color stripe trademark and Rubbermaid withdrew the broom and the suit was dismissed. Empire also began to produce a color banded broom but that was withdrawn by Rubbermaid when Rubbermaid acquired Empire.

Libman sells its brooms predominantly in supermarkets like Eagle Foods and Giant Foods. It also sells through mass market retailers such as K-Mart and Wal-Mart. Since 1990 Libman has sold over 3,720,000 of its color contrast band brooms with gross sales in excess of $10 million comprising 10% of Libman's business. Each year Libman's color band broom sales escalate:

| 1990 | 182,388 | $ 550,797 |
| 1991 | 728,628 | $1,949,241 |
| 1992 | 738,456 | $2,150,400 |
| 1993 | 1,010,424 | $2,917,846 |
| 11/22/94 | 1,060,740 | $3,117,334 |

The O'Cedar angled fiber broom in years past was the most popular seller in upright brooms. It has a small broom head with yellow fibers cut at an angle, the shorter bristles are stiffer than the longer bristles. See, Plaintiff's Exhibit 7, pp. 2 and 4. The O'Cedar angled broom was the first widely accepted angled broom in the United States. Libman, in about 1988, began to consider an angled broom. There are two ways to angle a broom—angle the head or cut the fibers at an angle. Libman chose to angle the head and the handle. It put a red stripe on the broom in August, 1988, and began to adver-

tise the broom to the trade in September, 1989. The broom was introduced into commerce, as stated above, in January 1990.

O'Cedar decided in January, 1992, to upgrade its very successful yellow angled fiber broom.[1] Thus O'Cedar introduced the O'Cedar 2000 color contrast broom. The existence of the 2000 broom was discovered by Libman on April 12, 1993. Libman protested the use of the color band on the O'Cedar 2000 broom to the Chief Executive Officer of the O'Cedar Division of the Drackett Products Co. But O'Cedar went forward with its plans[2] and the 2000 broom came on the market in May or June of 1993. This litigation followed.

## II.

The O'Cedar 2000 broom as it is offered for sale has a cardboard shroud or cover that hides most of the bristles although some of the bristles at both ends are visible through a clear plastic wrapping. Most of the bristles on the O'Cedar 2000 broom are a whitish gray and are at the end of the broom with the longer angled bristles. The thicker band of dark gray bristles is at the back end of the broom and is shorter and not angled. The cardboard cover announces that the darker bristles are Super Tuff[3] and are designed for tough spots or crevices. From a distance, with the cardboard cover in place, the O'Cedar 2000 Broom doesn't have the appearance of a Libman broom. With their covers removed, the two brooms are quite similar in appearance. The O'Cedar 2000 broom and the Libman 201 broom are the same width and each has a color band at one end of the broom. The O'Cedar and Libman brooms are sold through the same channels of trade and advertised in the same magazines.

The O'Cedar Professional Products Extra Wide Broom is the same width as the Libman Large Precision Angle Broom and each

has a color band at one end of the broom. The O'Cedar product has the stiffer bristles at the one end of the broom colored black and the remaining bristles are yellow. The wrapping of the larger O'Cedar broom is plastic, part of which is opaque. The advertising on the opaque portion of the wrapper does not obscure the fact that the broom has a color band at one end.

■ A necessary element of Libman's case is proof of the likelihood of confusion. Libman must show that the broom purchasing public is likely to confuse the Libman and O'Cedar color contrast brooms. *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 381 (7th Cir.) *cert. denied* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). The two brooms are similarly designed, are similar products, and have the same sale outlets and purchasers. The two products are advertised through the same media. *Ever–Ready*, 531 F.2d at 381–82. Libman has no evidence of actual confusion.[4] But as the witness Robert Libman pointed out, the purchase of a broom is not a large expense item and is not an event that is likely to cause a buyer to call up and complain about being confused about which product he or she bought. There is some evidence in the record that purchasers recognize the Libman mark and occasionally call on the telephone asking where they may purchase the broom they saw advertised. "[I]t is sufficient if someone adopts a ... trademark so like another in form, ... that one, with a not very definite or clear recollection as to the real trade-mark, is likely to become confused or misled." *Ever–Ready*, 531 F.2d at 382, (quoting *Spangler Candy v. Crystal Pure Candy Co.*, 353 F.2d 641, 644 (7th Cir.1965)). While a market study of likelihood of confusion would have been helpful evidence to the court, the elements of a *prima facie* showing of likelihood of confusion are present and Vining has not rebutted

1. This coincides with the time that Libman's color banded 201 broom sales escalated from 182,000 to 728,000 per year.

2. This was right at the time that Vining was in the process of acquiring the O'Cedar division from Drackett.

3. An O'Cedar trademark.

4. Proof of actual confusion is not necessary. "As we have stated many times, however, the plaintiff need not show actual confusion in order to establish likelihood of confusion." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993).

that showing. The court finds, therefore, that it is more probably true than not that the O'Cedar use of a contrast color band on its brooms is likely to cause confusion among ordinary purchasers as to the source of the brooms.

■ While the evidence is not strong on the question of Vining's bad faith or actual intent to infringe, there was certainly no effort on its part to avoid infringement. In fact, at best it appears that the O'Cedar people just didn't care. The Vining witness who was responsible for the development of the 2000 broom with the contrast color band said that he made no effort to check for trademark infringement. His rather lame excuse was that Vining's marketing division was responsible for that and he only checked for possible patent infringement. Vining went on with the sale of the 2000 brooms after it was notified of Libman's registration. One would have to be exceptionally credulous to accept at face value the assertion of the Vining witnesses, that when they decided to develop the 2000 product series in 1992, they were not aware of the Libman color banded broom in the market place or of its success. The evidence of bad faith here is certainly as strong as it was in *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993); and the court infers that Vining acted in bad faith in pursuing its marketing of color band brooms.

■ One of the arguments that flowed through the trial dealt with the use of color as a trademark. The court concludes that the Libman mark is not dependent upon any particular color. In fact the company has used contrasting bands of different colors since it began use of the trademark. The distinguishing feature, as the registration points out, is a contrasting color band at one end of the broom. In addition to the presumption of validity that attaches to the registration of the mark, the court notes the distinction about color as a trademark drawn by the cases decided in this circuit.

In *NutraSweet Co. v. Stadt Corp.* the court said "[a]lthough color alone cannot be protected as a trademark, it may be protected if it is used in connection with some symbol or design...." 917 F.2d 1024, 1027 (7th Cir. 1990) (citing *Barbasol Co. v. Jacobs,* 160 F.2d 336, 338 (7th Cir.1947)). Libman's contrasting color band is not just a color, but a protectible design. The Libman mark is new and is still building consumer recognition. As Robert Libman testified, trying to acquire a mark of distinction in the broom trade, is something done over time.

■ The court concludes that Vining has infringed Libman's trademark by its production and sale of the O'Cedar 2000 broom and the O'Cedar Professional Products Extra Wide Angle Broom and that Libman is entitled to an injunction against further sale of the O'Cedar brooms and to recover Vining's profits from those already sold.

### III.

The Lanham Act provides that a successful plaintiff may recover against the infringer three categories of monetary damages: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) (1982 & Supp.1994). *See also, Intel Corp. v. Terabyte International, Inc.,* 6 F.3d 614, 620 (9th Cir. 1993); *Broan Manufacturing Co. v. Associated Distributors, Inc.,* 923 F.2d 1232, 1235 (6th Cir.1991). "The court shall assess such profits and damages or cause the same to be assessed under its direction." 15 U.S.C. § 1117(a). Prejudgment interest, although not expressly provided for in section 1117(a), is within the discretion of the court. *Sands, Taylor & Wood,* 978 F.2d at 963; *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989).

■ The defendant's profits that must be disgorged are his net profits. The costs necessary to generate the income from the infringing products must be estimated by the court and allowed as a deduction from gross profits. *Murphy Door Bed Co. v. Interior Sleep Systems,* 874 F.2d 95, 103 (2nd Cir. 1989). "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

 According to Libman's accountant, Vining made a net profit of $1,108,850 on the sale of the infringing O'Cedar brooms. According to Vining's accountant, Vining lost $512,112.03 on the sale of the O'Cedar 2000 brooms. It all depends on how you count the beans.

Both sides started their calculations with the same uncontested sales figures.[5] Vining calculated a loss by setting off against its sales, *all* of its O'Cedar division costs and expenses. The court finds this to be unpersuasive. Vining's chief financial officer counted the beans improperly by setting off company expenses that were not attributable to the sale of the infringing brooms. In essence, Vining failed to "prove all elements of cost or deduction claimed," as required by 15 U.S.C. sec. 1117(a). Therefore the correct calculation of profits is that of the Libman accountant, Mark Hosfield of Coopers & Lybrand. Mr. Hosfield adjusted the costs/expenses figure so that it did not include blanket O'Cedar costs not properly attributable to the infringing brooms. *See* Plaintiff's Exhibit 2, pp. 2–4.

Libman also seeks prejudgment interest on the Vining profits to which Libman is entitled. Libman may recover that interest. *Sands, Taylor & Wood Co. v. Quaker Oats Co.* 978 F.2d at 963; *see also, Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir.1989). The witness Hosfield computed that interest as $58,840. Plaintiff's Exhibit 32, Sched. A.

### IV.

The Clerk is directed to issue an injunction enjoining and restraining Vining Industries, Inc. from continuing to distribute or offer for sale its line of O'Cedar 2000 color banded brooms and the O'Cedar Professional Products Extra Wide Angle color banded brooms. Vining, pursuant to 15 U.S.C. § 1116, shall be directed by the injunction to file with the court and serve on the plaintiff, within thirty days after service on Vining of the injunction, a report in writing under oath setting forth in detail the manner and form in which Vining has complied with the injunction.

The Clerk is further directed to enter judgment in favor of the plaintiff, The Libman Company, and against the defendant, Vining Industries, Inc., in the sum of $1,167,690.00 together with costs of suit.

8–27–94 to 11–27–94    $435,318.40

(Sales of the O'Cedar 2000 brooms represent only ⅔ of 1% of Vining's total business.)

---

5.  O'Cedar sales figures are as follows:

O'Cedar 2000 brooms:

| | | |
|---|---|---|
| 1993 | 162,416 | $894,458.41 |
| 1994 to 8–27 | 185,290 | $1,001,631.05 |

O'Cedar Professional Products Extra Wide brooms: